Johnnie **EDWARDS**, Plaintiff,

v.

**GALVESTON–TEXAS CITY PILOTS and GALTEX PILOTS SERVICE CORP., Defendants.**

No. 01–CV–347.

United States District Court, S.D. Texas, Galveston Division.

May 8, 2002.

---

Reginald E. McKamie, Sr., Attorney at Law, Houston, Tx, for Plaintiff.

James T. Brown, Legge, Farrow, Kimmitt and McGrath, Houston, TX, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff Johnnie Edwards ("Edwards") brings this lawsuit against Defendants Galveston–Texas City Pilots ("the Pilots") and Galtex Pilots Service Corporation ("Galtex") (collectively "Defendants"), alleging that they discriminated against him by not selecting him as a maritime deputy pilot on two separate occasions. Edwards specifically avers causes of action under Titles 42 U.S.C. §§ 1981, 1985, 1986, 1988, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Texas Commission on Human Rights Act, Tex. Lab.Code § 21.001 et seq., as well as state law claims for fraud, intentional infliction of emotional distress, and conspiracy to violate a constitutional right to contract. On March 1, 2002, Defendants filed a Motion for Summary Judgment. For the reasons below, Defendants' Motion is hereby **GRANTED**.

### I.

Plaintiff Edwards is a licensed maritime officer with five years of harbor tug experience in Galveston Bay and eleven years of deep-sea experience aboard ocean faring vessels. Defendants are a group of maritime pilots, collectively known as Galveston–Texas City Pilots, and a corporation of which they are all shareholders, Galtex Pilots Service Corporation. The Pilots are maritime ship pilots who provide local nautical knowledge about Galveston and Texas City navigational waters to ship captains of seagoing vessels. They assist seagoing captains with the arrival and departure of their ships from the Galveston sea buoy to various berths in Galveston County. Galtex is a corporation owned by the Pilots and alleged to employ deputy pilots, own property, pay employees, sign leases, and conduct other day-to-day business for the Pilots.[1]

Edwards, an African–American, unsuccessfully applied for a deputy pilot position with the Pilots on two separate occasions, once in 1999 and again in 2000. Edwards alleges that the Pilots did not select him for the position in both instances on the basis of race, thereby giving rise to his various federal and state law discrimination claims. The first instance of discrimination allegedly occurred in 1999. Early in that year, the Pilot Board approved four deputy pilot vacancies. In accordance with their standard procedure, the Pilots commenced accepting applications for these vacant positions. From this pool of applications, each pilot nominated two candidates to a "short list."

---

1. Defendants maintain that they are not "employers" within the meaning of Title VII. In determining whether a defendant is a Title VII employer, courts engage in a two-step inquiry. First, the defendant must fall within the statutory definition of "a person engaged in an industry affecting interstate commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. § 2000e(b). Second, there must exist an employment relationship between the plaintiff and the defendant. See id.; Deal v. State Farm County Mut. Ins. Co., 5 F.3d 117, 118 n. 2 (5th Cir.1993). The Court agrees with Plaintiff that a fact issue exists regarding Defendants' employer status under Title VII. Although Defendants claim that the Pilots are merely a group of independent contractors and that Galtex is merely a service corporation for the Pilots, Plaintiff produces at least some evidence showing that Defendants control the deputy pilots' daily work functions, which is the most crucial factor in assessing the existence of an employment relationship. See Deal, 5 F.3d at 119. Accordingly, the Court accepts for present purposes Plaintiff's assertion that Defendants are Title VII employers.

This short list was then forwarded to the Pilot Board, which, although taking into consideration the Pilots' recommendations, fashioned a final and more circumscribed list of qualified candidates. The Pilot Board's approved list was then presented to the Pilots for voting, and the first four candidates who received two-thirds of the Pilots' votes were slated to fill the vacant positions. In 1999, Edwards submitted an application to the Pilots for the deputy pilot position. Although Edwards was nominated to the short list by Captain John Lane ("Lane"), he was subsequently excluded from the Pilot Board's final approved list. Edwards was allegedly notified of his exclusion from the approved list by Captain William Kern ("Kern"), who also told Edwards that the Pilot Board refused to tell the Pilots why Edwards and other individuals were omitted from the final list. Based upon this information, Edwards filed a lawsuit against the Pilot Board in state court. Edwards successfully sought an injunction requiring the Pilot Board to place him on the approved list, and the Pilot Board acted accordingly. Notwithstanding this injunctive relief, Edwards nevertheless was not selected to fill one of the four vacant deputy pilot positions. According to Edwards, he garnered as many as six votes during the final voting process (one vote shy of meeting the two-thirds require-

ment), but was effectively blocked from obtaining the requisite additional votes by the "Aggie Pilots," [2] a group of pilots who Edwards claims were unwilling to support an African–American candidate.

Edwards' allegations of discrimination with regard to the 2000 application process are markedly similar, except that Edwards was not nominated to the short list by any pilot. In March of 2000, Edwards applied for one of two vacant deputy pilot positions. Captain Wendy Morrison ("Morrison"), who was charged with collecting and processing the applications, noticed that Edwards' application was incomplete because Edwards had failed to provide contact phone numbers for his previous employers. Morrison called Edwards for permission to fill in the required information, and then forwarded the corrected application to the Pilot Board. In the 2000 application process, the Pilots interviewed four African–American candidates for the deputy pilot positions, including Edwards, Darwin Peguese ("Peguese"), Graylin Gant ("Gant"), and David Manney ("Manney").[3] The Pilot Board later provided the Pilots with a list of sixty-seven individuals who were qualified to serve as deputy pilots. Peguese and Gant were disqualified from the list, leaving Edwards and Manney as the only African–American candidates that could be considered for nomination to the short list. Many pilots nominated Manney

2. Edwards avers that Captain Kern coined the name "Aggie Pilots" in reference to a group of pilots who attended Texas A & M Maritime College. Kern allegedly identified these individuals to Edwards as Captain James Borup ("Borup"), Captain James Coonrod ("Coonrod"), Captain Dennis Doherty ("Doherty"), Captain Michael Godinich ("Godinich"), Captain John Lane ("Lane"), Captain Wendy Morrison ("Morrison"), Captain Jack Smith ("Smith"), and Captain George Wyllie ("Wyllie"). Interestingly, several of these individuals did not actually attend Texas A & M, so the Court is unaware how this "name" attached, although it is inferred that these pilots preferred graduates of the excellent Texas A & M Maritime College located in Galveston.

3. With the exception of Manney (who was ultimately selected for one of the two vacant deputy pilot positions), all of the African–American deputy pilot applicants lodged a discrimination suit relating to this matter against Defendants in this Court. The other two lawsuits are styled *Peguese v. Borup, et al.,* Civ. A. No. G–00–519, and *Gant v. Borup, et al.,* Civ. A. No. G–01–586. Peguese's action was dismissed on summary judgment in June of last year, and Gant's claims are still pending before this Court.

to the short list, but no pilot nominated Edwards. After the short list was compiled, each Pilot was permitted to cast one vote for one of the nominees on the short list until two of the candidates received a two-thirds majority of the votes. During the first round of balloting, all eight of the alleged Aggie Pilots voted for Manney, as well as Christos Sotirelis ("Sotirelis"), a Caucasian–American candidate. Thus, Manney and Sotirelis were awarded the two vacant deputy pilot positions.

On the basis of these events, Edwards filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Pilots on February 6, 2001, alleging that the Pilots failed to select him as a deputy pilot in 1999 and in 2000 because of his race, and that the Pilots had been engaging in a pattern and practice of discriminating against African–American pilot applicants. The EEOC then mailed Edwards a notice of his right to sue the Pilots. On June 6, 2001, Edwards brought the instant lawsuit against Defendants, alleging causes of action under Titles 42 U.S.C. §§ 1981, 1985, 1986, 1988, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab.Code § 21.001 *et seq.*, as well as state law claims for fraud, intentional infliction of emotional distress, and conspiracy to violate a constitutional right to contract. On March 1, 2002, Defendants filed a Motion for Summary Judgment, to which the Court now turns.

## II.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.,* 477 U.S. at 248, 106 S.Ct. at 2510. The mere *existence* of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.,* 477 U.S. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691, 694 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving

party and draw all justifiable inferences in favor of that party. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (quoting Fed.R.Civ.P. 56(e)).

## III.

Defendants urge this Court to dismiss Plaintiff's lawsuit on the following principal grounds: (1) Plaintiff's claims of race discrimination relating to the 1999 deputy pilot selection process are time-barred; (2) Plaintiff's claims of race discrimination relating to the 2000 deputy pilot selection process fail to satisfy the *McDonnell Douglas/Burdine* burden-shifting analysis; and (3) Plaintiff's state law claims for fraud, intentional infliction of emotional distress, and conspiracy to violate a constitutional right to contract are not cognizable. In response, Plaintiff contends that: (1) Plaintiff's claims of race discrimination relating to the 1999 deputy pilot selection process are not time-barred because the statutory filing period did not commence until the pilots began work in June or August of 1999, and Defendants' conduct represents a "continuing tort"; and (2) Plaintiff has sufficiently demonstrated that Defendants' alleged legitimate, nondiscriminatory reasons for not hiring Edwards were merely pretextual.

### A. Plaintiff's claims relating to the 1999 deputy pilot selection process

Defendants argue that Edwards' claims relating to the 1999 deputy pilot selection process are time-barred because Edwards failed to file his charge of discrimination with the EEOC within the 300–day window required under Title VII, or file the instant lawsuit within the two-year statutory period prescribed under §§ 1981, 1985, and 1988, or the one-year statute of limitations set forth in § 1986.[4] Edwards, however, maintains that the statute of limitations did not commence until the new deputy pilots began work in June or August of 1999, and that Defendants' conduct constituted a "continuing tort" that extended into the 2000 application process. The Court respectfully disagrees with Edwards on both counts.

The key inquiry in resolving whether Edwards' claims are time-barred is determining exactly when the alleged discriminatory act relating to the 1999 selection process occurred. Defendants suggest that the alleged discriminatory conduct occurred in May of 1999, when the Pilots actually voted for and slated the four candidates into the vacant deputy pilot positions. Under this interpretation, Edwards' claims would clearly fall outside the relevant statutory time periods, since Edwards did not file his complaint with the EEOC until February 6, 2001 (in considerable excess of 300 days following the alleged discriminatory act), and similarly did not bring the instant lawsuit until June 6,

---

4. Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). However, in states like Texas where such discrimination is also prohibited by state law (also known as "deferral states"), a plaintiff is first required to file a charge with the state or local agency, which then lengthens the applicable limitations period to 300 days. 42 U.S.C. § 2000e–5(c) & (e)(1). Similarly, civil rights actions brought under 42 U.S.C. §§ 1981, 1985, and 1988 are deemed analogous to Texas tort actions, such that the applicable limitations period is the two years fixed by Tex. Civ. Prac. & Remedies Code Ann. § 16.003. *Helton v. Clements,* 832 F.2d 332, 334 (5th Cir.1987). A claim brought under § 1986 must be commenced within one year after the cause of action has accrued. 42 U.S.C. § 1986.

2001 (more than two years after the alleged discriminatory act). In an effort to circumvent these statutory bars, Edwards postulates that the alleged act of discrimination did not actually occur until the four new deputy pilots began working in June or August of 1999, such that Edwards' § 1981 action is timely. In any case, Edwards believes that Defendants committed a "continuing tort" that tolled the applicable statutes of limitations.

Although Edwards' argument is somewhat vaguely worded, the Court presumes that Edwards is attempting to invoke the continuing violation doctrine (as opposed to the continuing tort doctrine which applies only to torts). The continuing violation doctrine is a theory by which courts may toll or extend the statute of limitations to allow a plaintiff to recover for acts that would otherwise be time-barred where a defendant's conduct appears to be continuing in nature. Lisa S. Tsai, Note, *Continuing Confusion: The Application of the Continuing Violation Doctrine to Sexual Harassment Law,* 79 Tex. L.Rev. 531, 531 (2000) (analyzing the continuing violation doctrine in the context of hostile work environment sexual harassment claims). Notably, the continuing violation doctrine has frequently been described as "one of the most confusing and inconsistent areas of employment discrimination law," in large part due to the limited guidance provided by the Supreme Court and the widespread incongruous application of the doctrine by the various appellate courts. *See id.* at 534–35. Notwithstanding this fact, the continuing violation jurisprudence emanating from both the Supreme Court and the Fifth Circuit directly contravene Edwards' notion that the alleged discriminatory act did not commence until June or August of 1999, or that Defendants' conduct in 1999 and 2000 somehow comprises a single discriminatory act. This concept is aptly illustrated by two seminal cases, *Delaware College v.*

*Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and *Berry v. Board of Supervisors,* 715 F.2d 971 (5th Cir.1983). In *Ricks,* an African–American professor was denied tenure status, but did not file an employment discrimination suit against the college until after completing an additional one-year terminal teaching contract. 449 U.S. at 252–54, 101 S.Ct. at 501–02. The Supreme Court held that the statute of limitations began to run when the plaintiff was notified that he had been denied tenure, not upon the expiration of the one-year terminal contract. *Id.* at 258, 101 S.Ct. at 504. The court reasoned that the "proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful." *Id.* (quoting *Abramson v. Univ. of Haw.,* 594 F.2d 202, 209 (1979) (emphasis added in *Ricks* )). Following the Supreme Court's decision in *Ricks,* the Fifth Circuit in *Berry* established a three-prong test for assessing the existence of a continuing violation. The *Berry* court identified three factors that are relevant to the continuing violation inquiry: subject matter (whether the acts involve the same type of discrimination), frequency (whether the acts are recurring or more in the nature of an isolated employment decision), and degree of permanence (whether the act possesses the degree of permanence to trigger the plaintiff's awareness of his rights). 715 F.2d at 981.

Applying *Ricks* and *Berry* to the case at hand, the Court must fairly conclude that the alleged discriminatory act occurred in May of 1999, when the four vacant deputy pilot positions were filled, rather than in June or August of 1999, when the new deputy pilots started working. Like the college professor who was denied tenure in *Ricks,* Edwards suffered a discreet adverse employment action in May of 1999 when the Pilots failed to hire him, irrespective of when Edwards actually felt the

consequences of the action (i.e.: the actual start date of the job). As such, the statutes of limitations for Edwards' claims relating to the 1999 selection process undoubtedly commenced on the date that Edwards was passed over for the deputy pilot position. The Court reaches the identical result under *Berry*. Although the alleged discriminatory acts in 1999 and 2000 arguably involve the same subject matter (i.e.: on both occasions, the Pilots allegedly did not select Edwards because he was black), Edwards' assertion of a continuing violation is defeated by the much weightier frequency and permanence prongs under *Berry*. Here, Edwards avers two entirely isolated and independent discriminatory acts, one occurring in 1999 and another in 2000, both possessing the necessary degree of permanence to have triggered Edwards' awareness of his rights. Accordingly, Edwards' claims would also be proscribed under *Berry*. In light of these findings, the Court determines that Defendants' conduct in 1999 and 2000 does not comprise a single continuing discriminatory act, and consequently that Edwards' Title VII and Title 42 claims relating to the 1999 deputy selection process are barred by the applicable 300–day, one-year, and two-year statutes of limitations.

**B. Plaintiff's claims relating to the 2000 deputy pilot selection process**

Plaintiff also lodges a host of discrimination claims relating to the 2000 deputy pilot selection process pursuant to Titles 42 U.S.C. §§ 1981, 1985, 1986, 1988, Title VII, and the TCHRA. Section 1981 prohibits racial discrimination in the making and enforcement of contracts. *See* 42 U.S.C. § 1981. Section 1985 prohibits conspiracies to violate rights independently protected by the laws and the Constitution. *See* 42 U.S.C. § 1985. Sections 1986 and 1988 are ancillary causes of action, the first providing a remedy against individuals who neglect to prevent violations of § 1985, and the latter allowing for the recovery of attorney's fees in cases brought pursuant to these statutes. *See* 42 U.S.C. §§ 1985, 1986. Finally, Title VII makes it unlawful for employers to discriminate against employees or applicants on the basis of race, color, religion, sex, or national origin, while the TCHRA provides for the execution of Title VII in the state of Texas. *See* 42 U.S.C. § 2000e–2; Tex. Lab.Code § 21.001. In each of these causes of action, the common threshold inquiry is the existence or non-existence of intentional racial discrimination. *See, e.g., Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 714 (5th Cir.1994) (both in the context of § 1981); *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Almon v. Sandlin*, 603 F.2d 503, 505 (5th Cir.1979) (both in the context of § 1985); *Glover–Dorsey v. Univ. of Tex. Med. Branch*, 147 F.Supp.2d 656, 661 (S.D.Tex.2001) (Kent, J.) (in the context of Title VII). Thus, in order to recover under any of these claims, Edwards must demonstrate that Defendants intentionally discriminated against him on the basis of race.

In general, there are two ways a plaintiff can show he was a victim of intentional discrimination. "A plaintiff can prove discriminatory animus by direct evidence, or by an indirect or inferential method of proof." *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir.1995). If the plaintiff elects the former approach, the plaintiff must offer "direct" evidence of discrimination, defined as "evidence that, if believed, proves the fact of intentional discrimination without inference or presumption." *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir.1996). The clearest

example of "direct evidence" of discrimination would be "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (Posner, C.J.); *see also Mooney,* 54 F.3d at 1217–18 (analyzing characteristics of direct evidence).

Alternatively, a plaintiff may elect to prove the fact of intentional discrimination via the indirect or inferential approach. The indirect approach is governed by the familiar, tripartite burden-shifting scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). *See Armstrong v. City of Dallas,* 997 F.2d 62, 65 n. 2 (5th Cir.1993) (applying the burden-shifting analytical framework first established in *McDonnell Douglas* to analyze claims of intentional discrimination). However, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 617, 83 L.Ed.2d 523 (1985); *see also Brady v. Fort Bend County,* 145 F.3d 691, 711 (5th Cir.1998) (citing *Thurston* ); *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990) (same); *Ahrens v. Perot Sys. Corp.,* 39 F.Supp.2d 773, 780 (N.D.Tex.1999) (rejecting plaintiff's contention that she had stated a "direct evidence" case). Neither Party contends, nor does the Court believe, that Edwards has propounded any direct evidence of racial discrimination. Because Edwards' evidence is solely circumstantial or indirect, the Court directs its attention to the burden-shifting framework under *McDonnell Douglas/Burdine.*

### 1. *The Tripartite Burden-shifting Framework*

At the first stage of the *McDonnell Douglas/Burdine* burden-shifting approach, a plaintiff must establish a prima facie case of race discrimination. *See McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 992 (5th Cir.1996) (en banc). If the plaintiff makes out a prima facie case, a presumption of discrimination arises, and the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Rhodes,* 75 F.3d at 992–93.

If the defendant at this second stage of the *McDonnell Douglas/Burdine* analysis remains silent and fails to proffer a legitimate, nondiscriminatory reason for its action, there are two possible outcomes. If a reasonable fact-finder could not differ as to the existence of the facts constituting plaintiff's prima facie case, plaintiff will be entitled to judgment as a matter of law pursuant to either Fed.R.Civ.P. 50(a)(1) or 52(c). *See Hicks,* 509 U.S. at 509–510, 113 S.Ct. at 2748. But if reasonable minds could differ as to whether plaintiff has made out a prima facie case by a preponderance of the evidence, defendant is entitled to have the trier of fact decide that question. *See id.* Should the trier of fact find that plaintiff has indeed established his prima facie case by a preponderance of the evidence, it must render a verdict for the plaintiff, because, by definition, an unrebutted presumption mandates the finding of the fact presumed. *See id.* at 510, n. 3, 113 S.Ct. at 2748, n. 3.

Obviously, the *McDonnell Douglas/Burdine* framework is designed to put a price on a defendant's silence at the second stage of the tripartite burden-shifting framework. Thus a defendant may well choose not to remain silent at this stage, and instead attempt to meet its burden of production by proffering a legitimate, non-discriminatory reason for its actions. If the defendant does so, the presumption of discrimination is rebutted, and it drops from the case.[5] *See Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–95; *Hicks*, 509 U.S. at 507, 511, 113 S.Ct. at 2749 (once rebutted, the presumption "simply drops out of the picture").

At the third stage of the burden-shifting framework, the plaintiff is given a "full and fair opportunity to demonstrate" that the defendant's proffered nondiscriminatory reason is not true but instead a pretext for intentional discrimination. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1095; *see also Hicks*, 509 U.S. at 508, 113 S.Ct. at 2747. Although the *McDonnell Douglas/Burdine* framework shifts the burden of production between the plaintiff and the defendant, it is crucial to recognize that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *see also Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747.

**5.** Of course, while the rebutted presumption drops from the case, the alleged state of affairs underlying the prima facie case remains in the case if accepted by the fact-finder. Thus the fact-finder is free to consider those facts, along with others, and draw reasonable inferences from them in the course of making the ultimate determination of whether the plaintiff was the victim of unlawful intentional discrimination. *See Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095, n. 10.

**6.** The Court stands by its earlier statement that it is not necessarily fatal to a plaintiff's case if the person ultimately hired by the

#### a. *Plaintiff's Prima Facie Case*

■ To establish a prima facie case of racial discrimination, a plaintiff must show that: (1) he belongs to a protected group; (2) he was qualified for the position held or sought; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class or he was treated less favorably than others similarly situated or otherwise show that he was subjected to adverse treatment due to his race. *See Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998); *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246–47 (5th Cir.1985).

■ In this case, Defendants concede that Plaintiff has made a prima facie showing of discrimination. It is obvious from the record that Edwards belongs to a protected group, was certified by the Pilot Board as a qualified candidate for the deputy pilot position, and was subsequently denied the position. With regard to the fourth and final element, the Court queries whether Edwards was actually replaced by someone outside of his protected class, since one of the two vacant positions was filled by another African–American individual. Even assuming that Edwards was not replaced by a person outside of his protected class, however, Edwards has presented adequate evidence of adverse treatment based on race to satisfy the fourth element of the prima facie case.[6]

defendant is also a member of the protected class. *See Peguese v. Borup*, 129 F.Supp.2d 1048, 1052–53 & n. 2 (S.D.Tex.2001) (Kent, J.) (acknowledging and discerning as non-binding recent Fifth Circuit cases indicating that a plaintiff cannot make out a prima facie case of discrimination unless he can show that he was replaced by a person outside of his member group). The Court can envision scenarios, though somewhat unlikely, where an employer discriminates against someone on the basis of race, yet, for whatever reason, decides to hire someone from the protected class. If a plaintiff can show that he was treated adversely on the basis of his race, the

Specifically, Edwards points to the fact that the Pilots did not hire a single African–American pilot during its approximately 150–year existence prior to selecting Manney. Edwards also alleges that Captain Kern told him following the 1999 selection process that Captain Godinich said the Aggie Pilots would rather select a white female than "the N word." (Edwards Dep. at 17.) Additionally, Edwards produces a transcript of an alleged telephone conversation between Captain Kern and Darwin Peguese (another rejected African–American deputy pilot applicant), wherein Captain Kern states that Edwards "don't even have a chance of getting in," and that the Aggie Pilots only voted for Manney "cause they read that letter [Peguese] filed with the EEOC there and they got all panicked about it." (Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. 3 at A–5, A–6.)

### b. *Defendants' Nondiscriminatory Justifications*

Defendants' burden of producing evidence in support of a legitimate, nondiscriminatory reason underlying its action is "extremely light." *See Thornton v. Neiman Marcus,* 850 F.Supp. 538, 543 (N.D.Tex.1994). A defendant may satisfy that burden merely by producing any evidence, "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *See Hicks,* 509 U.S. at 509, 113 S.Ct. at 2748 (emphasis in original). The "defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254, 101

S.Ct. at 1094. Indeed, the defendant can even discharge his burden of production at this stage by proffering an illegal justification. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611, 113 S.Ct. 1701, 1707, 123 L.Ed.2d 338 (1993) (holding that defendant had proffered a "legitimate" nondiscriminatory justification sufficient to satisfy his burden under the second stage of the *McDonnell Douglas/Burdine* framework, even though the proffered justification was found to violate another body of law, § 510 of the Age Discrimination in Employment Act of 1967).

Here, Defendants have submitted competent evidence indicating that they did not select Edwards for a variety of nondiscriminatory reasons, including: (1) a lack of familiarity with Edwards; (2) concerns about Edwards' tugboat handling, radio communication practices, failure to heed commands, and general attitude towards superiors; and (3) a greater preference for other qualified candidates like Manney and Sotirelis, who performed well during their interviews and graduated from Texas A & M Maritime College. For example, Captain Borup states that Edwards "did a competent job as a tugboat operator" but "never exceeded my expectations either." (Borup Aff. ¶ 2.) Captain Coonrod refers to Edwards as a "below average boat handler with a poor attitude," specifically recalling an incident where Edwards "handled the job poorly and the ship started swinging" and then "made the situation worse ... by not accepting responsibility for his inability to operate his boat." (Coonrod Aff. ¶ 1.)

defendant's treatment of the other applicants is effectively irrelevant. *Cf. O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (holding, in a case under the Age Discrimination in Employment Act employing the McDonnell Douglas framework, that "[t]he fact that one person in the protected class has lost out to another member of the protected class is irrelevant, so long as he lost out because of [the protected characteristic]"). However, this does not concomitantly mean that the Court cannot draw reasonable inferences from these facts. The fact that a defendant hires a member of the protected class would tend to militate against the notion that the plaintiff was intentionally discriminated against.

Captain Wyllie remembers an incident where Edwards "nearly turned over the vessel," and avers that Edwards was "sometimes slow to respond to a command and slow in carrying out the order" and even "voiced objections to commands." (Wyllie Aff. ¶¶ 1–2.) Finally, many pilots were more impressed by Manney and Sotirelis' qualifications, interview performances, and the fact that they had received college degrees from Texas A & M Maritime College. (Borup Aff. ¶¶ 7–9; Coonrod Aff. ¶ 5; Godinich Aff. ¶¶ 10–11; Morrison Aff. ¶¶ 7–8; Smith Aff. ¶¶ 6–7; Wyllie Aff. ¶ 6.)

This evidence, if believed by the trier of fact, would certainly permit the inference that the adverse action against Edwards was motivated by a nondiscriminatory reason. Indeed, these concerns are *precisely* what pilots should candidly evaluate regarding prospective pilots who will berth and unberth enormous vessels carrying dangerous cargos in a congested waterway, surrounded by a sensitive ecosystem contiguous to large industrial complexes and population centers. Therefore, the Court finds that Defendants have fully carried their burden of production at the second stage of the *McDonnell Douglas/Burdine* framework. The presumption of discrimination created by Plaintiff's prima facie case stands soundly rebutted, and thus disappears from the case. *See Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–95; *Hicks*, 509 U.S. at 507, 511, 113 S.Ct. at 2747, 2749.

c. *Circumstantial Evidence of Discrimination*

The third stage of the *McDonnell Douglas/Burdine* framework is commonly referred to as the "pretext stage," an unfortunate and potentially misleading label. At this stage, the plaintiff, having lost the benefits of the presumption of discrimination, is given a "full and fair opportunity to demonstrate" that the defendant's proffered nondiscriminatory reason is not true but instead a pretext for intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *see also Hicks*, 509 U.S. at 508, 113 S.Ct. at 2748. The label "pretext stage," and other shorthand references to "pretexts" are potentially misleading insofar as they suggest that the plaintiff, by demonstrating the simple falsity of the defendant's proffered nondiscriminatory reason, has necessarily discharged his ultimate burden of persuasion: demonstrating that, more likely than not, he was a victim of unlawful intentional discrimination. In *Hicks*, the majority chided the dissent for conflating the term "pretext," understood to mean mere falsity of the employer's justification, with the more precise phrase, "pretext for discrimination." *See Hicks*, 509 U.S. at 513–14, 113 S.Ct. at 2750–51. As the Court explained, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* at 513, 113 S.Ct. at 2752. (emphasis in original).

The Fifth Circuit adopted the teachings of *Hicks*, and held, in an en banc decision, that for a plaintiff to withstand a motion for summary judgment, a two part test must be satisfied. The plaintiff must produce competent evidence that (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer, and (2) creates a reasonable inference that discrimination was a "determinative factor" in the actions of which the plaintiff complains. *See Rhodes*, 75 F.3d at 994 (en banc); *see also Casarez v. Burlington N./Santa Fe Co.*, 193 F.3d 334, 337 (5th Cir.1999) (citing the two-pronged *Rhodes* test). This carefully crafted rule recognizes that, in all cases, a plaintiff must prove that discrimination caused the adverse employment decision. However, a plaintiff may, in most cases, carry his burden on both prongs of this

test by introducing sufficient summary judgment evidence tending to disprove a defendant's proffered justifications. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–47, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000); *Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 402–03 (5th Cir.2001) (citing *Reeves* ); *Vadie v. Mississippi State Univ.,* 218 F.3d 365, 373 n. 23 (5th Cir.2000) (explaining how the Fifth Circuit's *Rhodes* opinion remains consistent with the Supreme Court's *Reeves* opinion), cert. denied, 531 U.S. 1150, 121 S.Ct. 1092, 148 L.Ed.2d 966 (2001). Thus, a plaintiff's evidence of falsity, combined with his prima facie case, "may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148, 120 S.Ct. at 2109.

As outlined above, the Pilots articulate a multitude of responsible, practical reasons why Edwards did not receive the sought-after position, most notably including Edwards' poor boat handling and radio communication practices, failure to heed commands, and negative attitude towards superiors. Defendants also express a greater preference for Manney and Sotirelis, both of whom performed well during their interviews, possessed excellent qualifications and experience, and graduated from Texas A & M Maritime College. Edwards retorts that these proffered reasons are merely pretextual. In support of this theory, Edwards emphasizes that Defendants never told him he was a poor boat handler, engaged in poor communication practices, or exhibited a bad attitude. Edwards also attaches letters of recommendation from other maritime pilots and academicians who attest to his outstanding piloting skills. Edwards further notes that several other pilots do not have college degrees. Finally, Edwards reiterates the statements allegedly made by Captain Kern that Captain Godinich said that the Aggie Pilots would rather hire a white female than an African–American, and that the Pilots only selected Manney in response to Peguese's EEOC complaint.

▉ The Court finds that Edwards has neither raised a fact issue as to whether Defendants' proffered justifications are disingenuous, nor created a reasonable inference that race was a determinative factor in Defendants' selection process. First, the mere fact that Defendants never advised Edwards that he was a poor boat handler, engaged in poor radio communication practices, failed to heed commands, or exhibited a bad attitude does not create a genuine fact issue regarding Defendants' motives. Each Aggie Pilot declares by affidavit various concerns with Edwards' skills and performance as a pilot, and many refer to specific incidents that illustrate these foibles. More importantly, Edwards himself admits that "[t]here's been some commands I've been given that I didn't carry out." (Edwards Dep. at 69.) This statement alone proves the merits of at least part of Defendants' justifications, irrespective of whether Defendants actually vocalized their concerns to Edwards. Furthermore, that Edwards is able to produce letters of recommendation from other pilots and academicians vouching for his piloting skills does not defeat Defendants' proffered assertions, since Defendants' opinions of Edwards are premised upon their personal interactions with him. Moreover, Defendants are not questioning Edwards' general qualifications. In fact, Defendants agree that Edwards could not have been certified as a candidate by the Pilot Board if he were not sufficiently qualified for the position. However, Defendants nevertheless felt that Edwards was less qualified than Manney and Sotirelis, as exemplified by his poor boat handling skills and radio communication practices, and occasional recalcitrance. The same conclusion can be drawn regarding

the Pilots' expressed preference for Manney and Sotirelis, both of whom performed well during their interviews, and boast degrees from Texas A & M Maritime College. While Edwards correctly notes that a college degree is not a requirement to join the Pilots, this does not mean that the Pilots are somehow precluded from harboring biases that favor college-degreed candidates over non-degreed candidates. This is especially true in the case at hand, where the vast majority of the "Aggie Pilots" attended Texas A & M, and like most other Aggies, probably possess a formidable sense of pride and loyalty in their alma mater. Edwards' own perception of the Aggie Pilots as a cohesive, tight-knit group bonded together by their common Aggie status further bolsters the view that the Pilots preferentially regarded candidates with college degrees, particularly those from Texas A & M.[7]

 Edwards' other evidence also fails to demonstrate that Defendants' proffered justifications are pretextual, or that race was a determinative factor in Defendants' decision not to select him as a deputy pilot. Primarily, Edwards relies on several statements allegedly made by Captain Kern, including a statement to Edwards that Captain Godinich said the Aggie Pilots would rather hire a white female than "the N word," and statements to Peguese during an apparent recorded telephone conversation that Edwards "don't even have a chance of getting in," and that the Aggie Pilots only selected Manney because "they got all panicked about" Peguese's EEOC complaint. Initially, the Court observes that Plaintiff's evidence is not competent summary judgment evidence, since Captain Kern's alleged statements to both Edwards and Peguese constitute clear

hearsay or are otherwise inadmissible. Captain Kern's reconstruction of Captain Godinich's statement, for example, aptly illustrates the fundamental purpose underlying the federal hearsay rules, namely, to ensure the trustworthiness of statements made in court. Here, Edwards' statement about Captain Kern's statement about Captain Godinich's statement about the Aggie Pilots is manifestly unreliable, considering that there exists an inherent possibility that Captain Kern took Captain Godinich's statement out of context, or somehow misconstrued Captain Godinich's intent. Furthermore, the alleged telephone conversation between Captain Kern and Peguese is entirely unauthenticated, making it impossible for this Court to verify the accuracy of Captain Kern's statements, or to determine whether Captain Kern made such statements at all. Fed. R.Evid. 901(a) stipulates that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(b) lists various acceptable means of authenticating evidence, including providing testimony of a witness with knowledge, or, in the case of voice identification, an "opinion based on hearing the voice at any time under circumstances connecting it with the alleged speaker," or for telephone conversations, some proof that the alleged call was made to the particular person at that time. Fed.R.Evid. 901(b)(1), (5), (6); *United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir.1988). Because Edwards has not properly authenticated the alleged telephone conversation between Captain Kern and Peguese, this Court would be hard-pressed to admit such evidence at trial, or to properly consider it here. In any

---

7. Incidentally, the law does not, wrongfully or rightfully, recognize a cause of action for discrimination based on a person's Aggie status, or affiliation with or preference for any college or training institution for that matter. Moreover, such bias, if any, serves as further negation of any racial bias as inferred or alleged in this case.

event, the Court would likely exclude these statements under Rule 403 since its probative value is likely to be substantially outweighed by its potentially prejudicial and misleading effect, and therefore assigns it no credibility in the instant analysis. *See* Fed.R.Evid. 403.

Even assuming arguendo that Captain Kern's alleged statements are admissible, the Court nevertheless reaches the same conclusion: that Edwards has not made the necessary showing of pretext, nor created a reasonable inference that race was a motivating factor. First, the statements themselves, whether viewed independently or holistically, are not sufficiently probative of racial discrimination. Notably, Captain Kern's statement to Edwards about Godinich's statement that the Aggie Pilots would rather hire a white female than "the N word" was made during a telephone conversation in February of 1999, more than one year prior to the May 2000 selection process about which Edwards now complains. This statement may have been made in reference to Edwards' candidacy in 1999, but it cannot reasonably be said to apply to the subsequent selection process in 2000. Even if the statement is relevant, however, its veracity is called into serious doubt by the Pilots' actual voting patterns in 1999. Captain Lane, one of the supposed Aggie Pilots, nominated Edwards to the short list in 1999, and voted for Edwards during the final voting process. Edwards himself admits to having received a total of six votes in 1999, just one vote shy of being selected for the position. These facts clearly do not support an allegation of racism.

In addition, Captain Kern's statements to Peguese are similarly flawed. Captain Kern allegedly told Peguese, among other things, that Edwards "don't even have a chance of getting in," and that the Aggie Pilots only voted for Manney "cause they read that letter [Peguese] filed with the EEOC there and they got all panicked about it." The Court is initially awestruck by the fact that these statements, to whatever extent verifiable and relevant, predominantly represent the opinions of a solitary individual within Defendants' group. During the course of his conversation with Peguese, Captain Kern refers to the Aggie Pilots generally, but noticeably fails to identify specific statements made by specific pilots tending to indicate the existence of racial discriminatory animus. From the face of the record, then, it appears that Captain Kern's statements are based almost exclusively upon his own individual perception, however personalized or skewed, of the Aggie Pilots' attitudes towards African–Americans. Notwithstanding this fact, the Court is additionally persuaded by the objective conduct of the Pilots throughout the 2000 selection process, commencing with Captain Morrison. Captain Morrison, another alleged member of the Aggie Pilots, was the person responsible for collecting the deputy pilot applications in 2000. Upon noticing that Edwards' application was incomplete, Captain Morrison called Edwards to request his permission to complete the application on his behalf. Captain Morrison then filled in the required information, and dutifully forwarded Edwards' application to the Pilot Board for consideration. Even more consequential, however, is the undeniable fact that the Pilots ultimately selected an African–American candidate for one of the two vacant positions. Of the sixty-seven qualified candidates placed on the short list in 2000, only two were African–American (Edwards and Manney). Despite these rather daunting odds, one African–American candidate was awarded one of the two deputy pilot positions. Although the Court firmly recognizes that Defendants' selection of an African–American candidate does not constitute an exculpation per se, it nonetheless regards this fact as an extremely compelling indicium

that Defendants' non-selection of Edwards was not motivated by racial bias. The fact that all eight of the Aggie Pilots unanimously voted for and slated an African–American candidate into one of two deputy pilot positions strongly indicates that Defendants' adverse treatment of Edwards was not premised on any racial considerations whatsoever, but rather upon Edwards' bluntly inferior professional skills. Furthermore, Captain Kern's alleged statement that the Aggie Pilots only voted for Manney because "they got all panicked" about Peguese's EEOC complaint simply does not hold water. Not only does this statement represent Captain Kern's unsubstantiated opinion, but it does not comport with Defendants' real world actions. If Defendants were truly behaving in response to Peguese's EEOC complaint, then Defendants would not have been so brazen as to disqualify Peguese during the 2000 selection process based on minor defects in his application.[8]

■ The fact that Defendants selected an African–American candidate, analyzed in conjunction with Defendants' numerous proffered legitimate, nondiscriminatory reasons for not selecting Edwards, sufficiently negates any reasonable inference created by Captain Kern's statements that race was a determinative factor in the 2000 selection process. In the absence of any other evidence demonstrating racial discriminatory animus, the Court is compelled to conclude that Edwards has failed to make the requisite showing of intentional racial discrimination under the applicable *McDonnell Douglas/Burdine* burden-shifting framework. Accordingly, Edwards' claims for race discrimination relating to the 2000 deputy pilot selection process must fail as a matter of law.[9]

8. Ironically, both Edwards and Peguese's applications were incomplete. Edwards had neglected to include contact phone numbers for his previous employers, while Peguese had failed to provide contact phone numbers for personal references, as well as certain other information about his employment history. Unlike Edwards, however, Peguese alleges that he never received a courtesy phone call from Captain Morrison informing him of his incomplete application. *See Peguese v. Borup*, 144 F.Supp.2d 743, 749 (S.D.Tex.2001) (Kent, J.). The fact that Captain Morrison did initiate a courtesy phone call to Edwards further buttresses the idea that the Aggie Pilots did not discriminate against Edwards on the basis of race.

9. Moreover, the Court holds that Edwards' Title VII claims relating to the 2000 deputy pilot selection process, including his vaguely averred retaliation claim, are time-barred. Edwards filed a charge of discrimination with the EEOC on February 6, 2001. The EEOC then sent to Edwards by certified mail a right-to-sue letter signed and dated on February 13, 2001, requiring Edwards to file suit within 90 days of receiving the letter. *See* 42 U.S.C. § 2000e–5(f)(1). Edwards, however, did not file the instant lawsuit against Defendants until June 6, 2001, in excess of the 90–day limitations period. Edwards argues that his Title VII claims are not time-barred because Defendants have failed to show the exact date that Edwards received the letter, and the limitations period does not commence until the grievant actually *receives* the right-to-sue letter. The Court disagrees. Although Defendants cannot prove the precise date that Edwards received the EEOC letter (in large part because Edwards testifies that he does not remember when he received the letter), there nevertheless exists a presumption in Title VII cases that an EEOC right-to-sue letter is received within three to five days after the letter is mailed. *See, e.g., Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (presuming receipt within three days of delivery based upon Fed.R.Civ.P. 6(e)); *Lozano v. Ashcroft*, 258 F.3d 1160, 1167 (10th Cir.2001) (presuming receipt no more than five days after mailing date); *Coen v. Riverside Hosp.*, 2 Fed. Appx. 449, 450–51 (6th Cir.2001) (holding that the 90–day limitations period begins running on the fifth day following the EEOC's mailing); *Ocasio v. Fashion Inst. of Tech.*, 9 Fed.Appx. 66, 68 (2d Cir.2001) (applying "usual presumption that the letter was received within three days after mailing"); *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d

## C. Plaintiff's state law claims

■ Finally, Defendants are entitled to summary judgment on Plaintiff's state law claims for fraud, intentional infliction of emotional distress, and conspiracy to violate a constitutional right to contract. To prevail on the fraud claim, Edwards must show that: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *Johnson & Higgins of Texas v. Kenneco Energy,* 962 S.W.2d 507, 524 (Tex.1998). Here, Edwards has failed to aver a single fraudulent statement uttered to him by any one of the pilots. As such, Edwards does not have a cognizable action for fraud in Texas as a matter of law.

■ Similarly, Edwards cannot prevail on his claim for intentional infliction of emotional distress. A plaintiff suing for intentional infliction of emotional distress under Texas law carries the arduous burden of showing that: (1) Defendants acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the resulting emotional distress was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Whether conduct is sufficiently outrageous is a question of law for the Court to decide. *Brewerton v. Dalrymple,* 997 S.W.2d 212, 216 (Tex.

1999); *Washington v. Naylor Indus. Serv. Inc.,* 893 S.W.2d 309, 313 (Tex.App.— Houston [1st Dist.] 1995, no writ). The Texas courts have rarely found the existence of extreme and outrageous conduct. *See Brewerton,* 997 S.W.2d at 216 (explaining that the conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"); *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612–13 (Tex.1999) (stating that mere insults, indignities, threats, annoyances, and petty oppressions do not rise to the level of extreme and outrageous conduct, especially in the workplace). Some evidence of a physical attack or threatening behavior is usually required. *See Humphreys v. Medical Towers, Ltd.,* 893 F.Supp. 672, 681 (S.D.Tex. 1995) (suggesting that plaintiff may have stated a claim for intentional infliction of emotional distress where defendant threw a paper weight in conjunction with making insulting comments). Even evidence of racial animus is not by itself sufficient. *Thomas v. Clayton Williams Energy, Inc.,* 2 S.W.3d 734, 741 (Tex.App.—Houston [14th Dist.] 1999, no writ).

■ In this case, the facts alleged by Edwards do not even begin to rise to the level of egregiousness required by the Texas courts to support a cause of action for intentional infliction of emotional distress. Edwards never complains of any overt mistreatment by Defendants during either the 1999 or 2000 selection processes.

236, 239 (3d Cir.1999) (same); *Sherlock v. Montefiore Medical Ctr.,* 84 F.3d 522, 525–26 (2d Cir.1996) (same). *Cf. Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir.1989) (recognizing the common law principle that "[p]roof that a letter properly directed was placed in a U.S. Post office mail receptacle creates a presumption that it reached its destination in the usual time and

was actually received by the person to whom it was addressed"). Because the EEOC mailed Edwards' right-to-sue letter on February 13, 2001, and Edwards proffers no evidence to rebut the presumption that he received the letter within three to five days after this date, Edwards' Title VII claims filed on June 6, 2001 are effectively time-barred by the 90–day limitations period.

Instead, several of the Aggie Pilots treated Edwards favorably by nominating him to the short list, voting for him, and facilitating the completion of his application. Even if it could be argued that some racial animus existed, Edwards never personally witnessed or experienced it. At bottom, Edwards' only real complaint against Defendants is that he was not selected for the deputy pilot position, and that Defendants allegedly thwarted his attempt at legal redress by choosing another African–American candidate. Denying Edwards a job, especially in the absence of any showing of discriminatory motive, hardly constitutes extreme and outrageous conduct. Given that Edwards' case is premised on racial discrimination, it is also wholly untenable for Edwards to suggest that Defendants' hiring of another African–American candidate is extreme and outrageous. In any case, Edwards has not offered *any* evidence of severe emotional distress. Because these elements are wanting, Edwards has failed to state a claim for intentional infliction of emotional distress as a matter of law.

Lastly, Edwards' claim for conspiracy to violate his constitutional right to contract is not viable. This cause of action appears to be a restatement of his § 1981 claim, which was dismissed in the previous section on other grounds. In order to succeed on a claim for civil conspiracy, Edwards must demonstrate that one or more unlawful, overt acts took place. *Thomas v. Collins,* 960 S.W.2d 106, 113 (Tex.App.—Houston [1st Dist.1997] writ denied). Because Edwards has presented no evidence that Defendants engaged in any unlawful act, Edwards' claim for conspiracy to violate his constitutional right to contract must also be dismissed.

### IV.

After carefully reviewing all of the substantial pleadings and evidence before it, and painstakingly analyzing and applying all applicable law, the Court finds that no genuine issue of material fact exists in this lawsuit. Edwards' claims essentially fail for the exact reason that Peguese's claims failed less than a year ago—there is simply no showing of intentional racial discrimination. For all of the reasons set forth above, the Court hereby GRANTS Defendants' Motion for Summary Judgment, and DISMISSES WITH PREJUDICE any and all of Plaintiff's claims against any and all Defendants in this action. Each Party is to bear its own taxable costs, expenses, and attorney's fees incurred herein to date.

IT IS SO ORDERED.